ROBERT W. HARPER, Admr. &c., *vs.* RICHARD T. ARCHER et al.

It is the settled doctrine, that the right of a husband to his wife's *interest in the* personal estate of which the former husband of his wife died seized, is inchoate, and his title to it is only complete when a division thereof has been made, and he has reduced the property into possession. *Held*, that the right to the property did not vest in A. during his marriage, but survived to his widow upon his death. *Harper* v. *Archer*, 8 S. & M. 229 ; *Duncan* v. *Johnson*, 23 Miss. 130 ; *Kilcrease* v. *Shelby*, Ib. 161, cited and confirmed.

Cases are numerous where possession of property may be presumed from circumstances ; such as the great lapse of time since the transaction occurred ; the death of witnesses cognizant of a matter so unlikely to be known or remembered by many persons, as who had possession of particular slaves at a stated remote date, and the consequent difficulty of making positive proof upon such a point, would seem to render a resort to circumstantial evidence, in the absence of positive proof, necessary to the ends of justice. *Held*, that the slaves must be regarded as having come to the possession of B. in his lifetime, and as constituting a part of his estate.

Where an executor or administrator, without any authority, purchases property for the estate, and no objection being made by those interested in the estate, to the use of the funds of the estate in that way ; the property so purchased must be treated in equity as the property of the estate.

The sale or exchange of the slaves by Mrs. B. during her widowhood, or by A. after their marriage, in pursuance of an agreement made with the widow before marriage, and this being done before a division of the estate between the widow and heir of B., it must be considered a severance in law of her interest in the estate to the amount of the value of the slaves, and an appropriation of them to her use; and so far as the husband participated in the sale, it must be considered as a reduction to possession of so much of the wife's interest in the estate. *Cabell* v. *Bell*, 1 How. 558 ; *Wade* v. *Grimes*, 7 Ib. 425, cited and confirmed.

Neither Mrs. B. nor A. had any power to dispose of the slaves of the estate, otherwise than in virtue of her interest in the estate as a distributee, and in that way alone can the disposition be valid. Nor had they any power to exchange the property of the estate, so as to bind the other distributees to take the property obtained, instead of the value of that disposed of. *Held*, that it must be regarded as a sale of so much of Mrs. B.'s interest in the estate as a distributee ; and it follows, that the slaves received in the transaction, became her individual property, and belonged to her husband (A.) and went to his administrator upon his death; and in the account and division to be made between Mrs. H. and S. E. A., she is chargeable with the value of the slaves belonging to the estate, and so disposed of.

It seems that after marriage, that A. lived on the plantation of B.'s estate, and only acted as agent or trustee of the parties in disposing of the crop; and when money came to his hands, he was entitled to such portion of it as belonged to his wife, but he was not entitled to, nor did he claim that portion due the child; and he cannot be considered in law or equity as having appropriated it to his use, so as to make his wife's interest in the estate chargeable with it in an account between her and the child. *Held*, that the father must be regarded as having received as trustee or guardian, the child's portion of the money, and the father's estate is chargeable with it in the account to be taken. The condition of A. in this respect, is not different from what it would have been, if the estate had been carried on by the administrator who had paid over to A. the proceeds of the crop, who would be regarded in equity as having received the portion due his son as his trustee or guardian, and be held accountable accordingly.

The administrator of B. settled his final account and surrendered the estate to Mrs. B. in 1828; but the account was not considered a final settlement, consequently the estate was in charge of the administrator, and he must be held accountable for it during the years 1828 and 1829.

Mrs. H. will be chargeable with the net proceeds of the estate of B., deceased, for the years 1830, 1831, 1832, and 1833, after deducting the necessary and proper charges for the support, education, and maintenance of E. F. B.; and also with the hire of the slaves of the estate which remained in her possession and use, and with the value of articles she received from the estate since the death of her husband, A.

R. T. A. will be chargeable individually with the annual value of all the slaves and other personal property of the estate of B., of which he had the use or possession since the death of A.; and with the rents and profits of the dower interest of the widow in the real estate from the same time; but the estate of A. cannot be chargeable to the distributees for the use and possession of the property since his death, because all his interest ceased with his death, and R. T. A., as his administrator, had no right to or interest in the estate. His connection with it is, therefore, as an individual, and as such he is accountable in law.

The failure of Mrs. H. to have her dower assigned to her, is no reason why she should not receive compensation for her right from one who has had the benefit of it. At law a widow was not entitled to rent for her dower interest until it had been set apart; but equity will give her an account of mesne profits before the assignment, though she die before her right to dower be established, and will decree an account of the rents and profits in favor of her representatives. *Held*, that Mrs. H. is entitled to an account from the time of the death of A., as sought in the bill.

In error from the superior court of chancery; Hon. Stephen Cocke, chancellor.

This was a bill filed in the superior court of chancery, by Robert W. Harper and Catharine his wife, against Richard T. Archer and others; and upon Mrs. Harper's death, the bill was revived in the name of Robert W. Harper, as her administrator. The bill charges that Edward F. Barnes died in April, 1827, leaving complainant's wife Catharine, his widow, and one child, Eliza F. Barnes, his only heirs.

Abram Barnes at May term, 1827, was appointed administrator; returned inventory at August term, 1827; presented and settled one account at August term, 1828; and died November 1, 1830, without having made any final settlement and division or distribution.

That after the death of Abram Barnes, complainant's intestate took the management and control of the real and personal estate of E. F. Barnes; resided with her daughter at the plantation, made crops, &c.

That on May 6, 1834, she married Stephen C. Archer, no division or distribution of the estate of E. F. Barnes having yet been made; and she being also entitled to dower in the land.

At the February term, 1835, of the probate court, S. C. Archer was appointed guardian of Eliza F. Barnes, and shortly after the marriage, he removed with some sixteen or eighteen slaves to the Oaken Grove place, and employed such negroes, with the negroes of the estate of E. F. Barnes, in planting, &c.

That Eliza died July 9, 1835; and Stephen E. Archer, her son by S. C. Archer, was born March 1, 1836; that Stephen C. Archer died August 21, 1837; that he never made any report or inventory of the property of his ward, or settled any account, or took any step to have the property divided; there has been no administrator de bonis non of Edward F. Barnes, and no administrator of Eliza F. Barnes.

That no division or distribution of the estate of Edward F. Barnes has ever been made, and that the rights of complainant's intestate survived to her after the death of S. C. Archer.

That R. T. Archer in January, 1838, and William Eggleston took out letters of administration, and one of the administrators of S. C. Archer took possession of the property in Claiborne county, and made an inventory in which he returned the

negroes of Edward F. Barnes, as belonging jointly to the estate of S. C. Archer and to his son S. E. Archer.

The answer admits that at the time of the marriage of complainant's intestate with S. C. Archer, there had been no division or distribution of the estate of Edward F. Barnes.

Admits there was no administrator *de bonis non* on Edward F. Barnes, because Abram Barnes had settled the estate, and delivered the property to complainant's intestate and her daughter, who were entitled to it, and there was no estate of E. F. Barnes left unadministered; and admits also that Archer returned no inventory, or account as guardian of Eliza F. Barnes, or took any steps to have a division.

It denies that there is any estate of Edward F. Barnes to be divided or distributed, or that any part of the personalty has survived to complainant's intestate; is advised that on her intermarriage with S. C. Archer, all the personal property which she derived from the estate of Edward F. Barnes, (being one half said estate,) vested *instanter* in the said S. C. Archer *jure mariti*, and became absolutely his. In addition to which, said Stephen immediately upon his marriage took the same into his possession and retained it until his death, since when it has been in the possession of his administrator; and this question at this time, is now before the high court of errors and appeals of this State for adjudication, upon an appeal taken by complainant from an order of the probate court of Claiborne county, decreeing a division of the personal estate formerly belonging to the estate of Edward F. Barnes, between Stephen E. Archer and the estate of S. C. Archer.

It admits that Eggleston has settled and resigned, and that the entire personalty of S. C. Archer is in possession of R. T. Archer, as sole administrator.

A petition was filed March 28, 1842, by R. T. Archer and W. Eggleston, guardians of S. E. Archer, setting forth that no division of the personal estate of Edward F. Barnes, had ever been made, and praying for a division. Harper and wife answer, claiming that the share of the wife survives to her, and praying that one half the estate be allotted to her. The probate

court decreed that the property should be distributed, one half to petitioners' ward, S. E. Archer, and the other half to the estate of S. C. Archer, of which petitioners were the administrators. Harper and wife appealed, and the high court awarded one half the estate to Mrs. Harper, instead of to the estate of S. C. Archer.

The execution of this decree was resisted by Archer, until an attachment was moved for at March term, 1848, when he filed a bill in chancery to enjoin it, which was decided against him by the high court the 6th March, 1855.

The deposition of L. P. Maxwell, shows that S. C. Archer, after he married the widow of Barnes, kept the accounts of the "estate of Edward F. Barnes" separate from his own.

W. M. Randolph for defendant, testified, that all the property S. C. Archer died possessed of, including the slaves of the estate of E. F. Barnes, remained in possession of his widow, until R. T. Archer was appointed administrator, when she yielded the possession to him. The probate court record shows that they were all inventoried as the property of S. C. Archer. That until after her marriage with Harper, Mrs. Archer regarded the slaves as belonging to estate of S. C. Archer.

Samuel Coburn testifies, that he was one of the appraisers of the estate of S. C. Archer; the Barnes negroes were included in the appraisement; Mrs. Archer was present, knew of the appraisement, and made no objection. He says that part of the negroes were appraised at the mansion-house at "Oaken Grove," and part on the other land bought of Barland and German; cannot say that any of the Barnes negroes were among those appraised at Oaken Grove; Mrs. Archer was about the house at Oaken Grove, but cannot say that she saw any of the negroes that were appraised, nor that the inventory and appraisement were shown to her, though she probably knew the inventory, &c. were being made.

McCorkle says, some of the Barnes negroes, when he went to live with S. C. Archer, were at Oaken Grove, some at the "Barland," and some at the "German" places.

The answer of R. T. Archer, states that previous to his death

S. C. Archer had removed most of the Barnes negroes from Oaken Grove, to the places purchased from Barland and German, where they were at the time of his death.

The chancellor dismissed the bill, and Harper prayed a writ of error to this court.

*H. T. Ellett,* for appellant.

It is manifest that there is nothing to take this case out of the principle settled in *Wade* v. *Grimes,* 7 How. 433. Indeed, the right of the complainants to the slaves is settled by the final adjudication of this court in 8 S. & M. 229, reaffirmed on the 6th of March, 1855, after an injunction in chancery to restrain its execution. The right has thus been tried and determined between the same parties, and cannot be litigated over again, even though the party may think he has got a better hold.

In the answer of R. T. Archer, in this case, he expressly declines to discuss the point, whether the share of complainant, Mrs. Harper, survived to her after the death of S. C. Archer, and he does so because he says "the whole question" was then before this court, in the other case. That case is now decided, and redecided on a bill in chancery, presenting all the points involved in this bill. Surely, there must be some end of litigation.

If the merits were open, there is nothing to distinguish the case from *Wade* v. *Grimes,* 7 How. 425, and *Shelby* v. *Kilcrease,* 1 Cushm. 161.

Here the estate of Edward F. Barnes is admitted to remain undivided and undistributed; Abram Barnes, the administrator, died, and the property remained in possession of the widow of Edward F. Barnes, after the death of Abram Barnes, as it had done in his lifetime, except only as to the disposal of the crops. Mrs. Harper, while she was Mrs. Barnes, never pretended to claim any right to any specific portion of the property.

S. C. Archer, after his marriage with her, made no such claim, but on the contrary, kept his accounts respecting this property distinct from his own private accounts, and in the name of the "estate of E. F. Barnes."

He was about to take such steps as were necessary to have the property divided, when Miss Barnes died, and he then thought he was entitled to the whole, in right of his wife. So says R. T. Archer's answer.

R. T. Archer, when he came to administer this property, treated it as the unadministered estate of E. F. Barnes, of which one half would go to S. C. Archer's estate, and the other half to his son, as heir of his half sister. It is absurd to suppose that Mrs. Archer's failure to object to the appraisement, estops her from claiming her rights. Indeed, the inventory and appraisement are not in the record, and cannot be proved by parol. But at most, the conduct of Mrs. Archer could amount only to an admission of a fact, namely, the right of the estate of S. C. Archer to her share of the estate of E. F. Barnes. What does such an admission amount to? Suppose she believed the estate of Archer was entitled to the property, and so believing, admitted it. It would be her belief as to the law. Would it preclude her from asserting her legal rights, no person having dealt with, or acquired rights in the property on the faith of her admissions? The question is, Was the estate of Archer entitled, or did her interest in Barnes's estate survive to her after the death of Archer? Her admission of any fact, might be of weight against her, but her admission of what the law is upon the facts, is not to be regarded.

The truth is, on scrutinizing the testimony of Randolph and Coburn, she admitted nothing whatever in regard to her rights.

The question whether there ever was a division or distribution of Barnes's estate, so that Archer might reduce his wife's share to possession, is set at rest by the petition filed by Archer and Eggleston, guardians of S. E. Archer, to procure such division, alleging that it had never been made.

The same Archer and Eggleston, the guardians of S. E. Archer, are also the administrators of Stephen C. Archer, and thus all parties were fully represented in the probate court, and in this court, in the case decided in 8 S. & M. 229.

*F. Anderson*, on the same side.

The case of *Harper* v. *Archer*, 8 S. & M. 232, settles the question of the right of Mrs. Harper to one half the estate of her deceased husband, Barnes. 8 S. & M. 232; *Wade* v. *Grimes*, 7 How. 432; *Henderson* v. *Guyzot*, 6 S. & M. 211. The same principle is decided in the case of *Shelby*·v. *Kilcrease*, 1 Cushm. 162.

There being no administrator (at the time of filing the bill) on the estate of Edward F. Barnes, the chancery court has jurisdiction, especially as it is admitted that there are no debts of that estate, and as the defendant Richard T. Archer, is a mere intermeddler, an executor *de son tort.* 1 How. 558; 4 Ib. 458; 4 S. & M. 711.

Mrs. Harper is entitled to the rents and profits of her dower right since the death of her first husband (Barnes), and Archer must account for, and even her death does not prevent it. Park on Dower, 332.

The accounts prayed in the bill, being such as the probate court could not settle, give the chancery court jurisdiction.

No final account by the administrators was ever confirmed by the probate court, or order of distribution. There was no citation issued, and of course there could be no decree. Hutch. Code, 682, § 12; *Washburn* v. *Phillips*, 5 S. & M. 600; 12 Ib. 649; 13 Ib. 133.

*Potter*, for appellees.

No court ever pretended that the rights of a husband, in lands of his wife, would not attach because she held as tenant in common with another. 1 Lomax, Real Property, 69; Ib. 490. The point to be decided is, Was the right of Mrs. Barnes a chose in action, or property? And we might search in vain for a case to show that the right of two owners and possessors in common of real or personal estate was a chose in action. Every thing in action may become a thing in possession, and it would puzzle the most ingenious to say when and how the two might have the thing in possession, if their common possession and ownership constitutes a mere right in action. The fact is plain; there was a legal possession under claim of own-

ership, and it is impossible to imagine a more perfect reduction to possession.

Where slaves were held by a guardian, in common and undivided, for female wards, and one married, it was held that the marital right attached, and the share of the wife vested instantly in the husband. *Chambers* v. *Perry*, 17 Ala. 730; *Hopper* v. *McWhorter*, 18 Ib. 229.

So, in other cases of tenants in common, and joint-tenants, of personalty. *Pettijohn* v. *Beasley*, 4 Dev. 512, and cases cited; *Heath* v. *Heath*, 2 Hill, Ch. R. 104.

So in a case quite like the present, where there had been an administration, and the slaves, undivided, went into possession of the distributees, one married, and it was held that her share vested *eo instanti* in her husband. *Stephens* v. *Doak*, 2 Ired. Eq. R. 348; *Jackson* v. *Sublett*, 10 B. Monr. 467.

It is plain that property thus held is in no sense a chose in action, which is defined as follows:—

" While the thing, or its equivalent, remains in suspense, and the injured party has only the right, and not the occupation, it is called a chose in action; being a thing rather *in potentia*, than *in esse;* though the owner may have as absolute property in, and be as well entitled to, such things in action as to things in possession." 2 Black. Com. 397.

The case of *Scott* v. *James*, decided by this court, was like the case at bar in all important particulars. There was a bequest to wife and daughter, and the property, including slaves, was to be kept together until the daughter became of age or married, when it was to be equally divided. The wife and another were named as executrix, &c., but she never qualified. The wife, after testator's death, married twice; her second husband " took and kept possession of the property until his death." The controversy was between his daughters and the third husband. This court held that the slaves vested in the second husband. The first point decided was, that it was a vested legacy; and then came the question, Had the second husband reduced it to possession?

On this point this court said:—" It is agreed between the

counsel, that James (second husband) claimed the property of his wife in his own right, by virtue of the marriage. This was undoubtedly the highest act of ownership, and a sufficient possession to consummate his right. It was all that he could have done, because, by the will, the property was to be kept together and not divided until the daughter became of age or married." 3 How. 313.

What is the scope of this decision? It affirms that no formal division, nor any division at all, is necessary; that the right of the husband attaches upon property held by the wife in common with another; and it also affirms that possession by the husband, claiming *jure mariti*, even before the wife could claim a division, is sufficient. His possession, under such circumstances, is affirmed to be "the highest act of ownership, and a sufficient possession to consummate his right." The doctrine of this case was expressly affirmed in *Wade* v. *Grimes*, 7 How. 435, 436.

Other decisions of this court affirm all we contend for, in relation to the marital right.

*Cable* v. *Martin*, 1 How. 558. Bell, the husband of a distributee, was administrator in her right. There was no division or distribution, but he sold some of the slaves of the intestate at private sale. It was held that the purchaser acquired the interest the wife, as distributee, had in those slaves. This court said:—" When she married Bell, he thereby acquired title to her portion." p. 563.

*Lowry* v. *Huston*, 3 How. 394,— bequest of slaves. Held that husband had title, though no possession; and his sale passed the interest of the wife.

*Magruder* v. *Stewart*, 4 How. 204. Brocus bequeathed slaves to wife for life, and on her death, they were to "revert to gross estate." Plaintiffs married daughters of the wife, and sued alone. There was no possession nor division. Pending the suit one of the husbands died, and it was revived by his administrator, and plaintiffs recovered.

*Baines* v. *McGee*, 1 S. & M. 208. The husband of a distributee was administrator. He sold slaves of the estate at private
19*

sale, and though no division had been made, it was held that the purchaser took the wife's interest.

*Kilcrease* v. *Kilcrease*, 7 How. 311.   Petition showed that appellee received slaves as distributee of her first husband, on an informal division, in which the other distributees concurred. Held that her title was good.

What is the rule in the other cases?

*Wade* v. *Grimes*, 7 How. 425, went upon the fact of no partition, nor any act by second husband " evincing an assertion of title." Ib. 434.  " Her second husband, Carter, does not appear to have ever concerned with it in any way." Ib. 432.

*Harper* v. *Archer*, 8 S. & M. 229.  A mere dictum; but here, too, we find allusion to the fact that the husband took no steps to reduce the property to possession.

*Clark* v. *Mc Creary*, 12 S. & M. 347, related to slaves; but there was neither possession nor distribution until after the woman's law of 1839.

*Duncan* v. *Johnson*, 1 Cushm. 130.   The leading point is still declared.   The husband resided on the plantation, but, said the court, " it does not appear that he assumed the control or management."   There is, it is true, a dictum, to the effect that this would not alter the case; but the decision is upon the want of possession *jure mariti.*

*Kilcrease* v. *Shelby*, 1 Cushm. 161.   There had been a formal, final decree, and a holding under it till a bar by limitation; and that fact settled the case.

It is a settled rule, that, upon the death of an intestate, the distributive shares in his estate vest immediately in his heirs and next of kin.   *Haywood* v. *Haywood*, 20 Pick. 519, and cases cited.

The course of descent and distribution, in such a case, becomes fixed, and no lawyer will pretend that subsequent legislation or death of parties could change it.   But administration is to be had of the personalty, and the legal title to that is to be vested in an officer of the law, for the sole purpose of paying the debts and preparing the property for distribution, who is trustee for the distributees as well as creditors; and it has

often been held that when the legal title is outstanding, the equitable interests of the wife pass to the husband.

*John B. Coleman,* on the same side.

I submit, as a summary of our views of the law and the facts of this case, the following points :—

1. That complainants have failed to establish their claim to a decree against Richard T. Archer, as the distributee, in right of his wife, of Abram Barnes, for any sum whatever.

2. That Mrs. Harper has failed to establish her title to any portion of the negroes claimed in the bill, first, because all her interest in them was reduced into possession by Stephen C. Archer during the coverture; secondly, because, even if it were not, she, subsequent to his death, relinquished all her interest in them to his estate.

3. That if both these positions should be overruled, she is shown to have no interest whatever in Peter, Judy, and their children, in Arthur, Venus, and their children, or in Grace, Caty, Ann, or Robert; nor in Gatty, Eliza, Davy, or Big Grace, who are proven to be dead.

4. That upon the division to be made between Mrs. Harper and Stephen Edward Archer, of the residue of the negroes named in the bill, Mrs. Harper must stand charged with having received, on account of her portion, Peggy, Priscilla and her two children, and Ralph, Charlotte, and Gabriel, which are proven to have been sold by her and Stephen C. Archer.

5. That upon said division, Mrs. Harper must also stand charged to Stephen Edward Archer with one half the net proceeds of the crop of each of the years 1828, 1829, 1830, 1831, 1832, and 1833, after crediting her with the expense of raising it, with the hire of such of her own negroes as worked in the crop, and with the expenses of Eliza F. Barnes; and that she must also stand charged with interest on the balance against her each year, up to the rendition of the decree.

6. That Mrs. Harper will be entitled to hire from the estate of Stephen C. Archer, from the 21st August, 1837, to the date of the decree, for such of the negroes worked by his administrator as shall be allotted to her upon the division, deducting

therefrom the value of what she has received from said estate during the same period.

7. That the claim of Mrs. Harper for the rent of her dower interest in the Oaken Grove plantation, must be disallowed.

8. That the motion for the appointment of a receiver must be denied.

Mr. Justice HANDY delivered the opinion of the court.

This case is a continuation of the same controversy heretofore before this court in the case of *Harper* v. *Archer*, reported in 8 S. & M. 229. The rights of other parties, however, are involved, and many questions presented which were not directly involved in that case.

The present case was a bill filed in the superior court of chancery by Robert W. Harper and Catharine his wife, against Richard T. Archer in his own right, and as administrator of Stephen C. Archer, and Stephen E. Archer a minor, to recover the portion due Catharine Harper from the estate of her first husband, Edward F. Barnes, deceased. The statements of the bill necessary to be considered, are in substance as follows:—

That Edward F. Barnes died intestate, in April, 1827, leaving one child, Eliza F. Barnes, and the complainant Catharine, his widow, who in May, 1834, married Stephen C. Archer, who died intestate in August, 1837, leaving a son, Stephen E. Archer, the defendant, the only issue of that marriage, and the said Catharine, his widow, who intermarried with the complainant Harper, in September, 1841; that Edward F. Barnes died seized and possessed of a plantation called Oaken Grove, and a large number of slaves and other personal estate, and in May, 1827, Abram Barnes was appointed administrator of the estate, and returned an inventory to August term, 1827, of the probate court, and at August term, 1828, he returned an account as administrator, which was allowed, and up to the time of his death in November, 1830, he acted the part of friend and guardian for the widow and child, cultivated the plantation and received the proceeds, but never settled any account for the same with the probate court; that after his death, Catharine resided with her child on the plantation, managed it, and

received the proceeds of the crops of 1830, 1831, 1832, and 1833; that after her marriage to Stephen C. Archer, he removed sixteen or eighteen of his slaves to the Oaken Grove plantation, where they were employed, and where he resided till his death, and the crops raised on the plantation by the slaves of Barnes's estate, assisted by a few of those of Stephen C. Archer, for the years 1834, 1835, and 1836, were sold and proceeds received by him; that Eliza F. Barnes died in July, 1835, and in March, 1836, Stephen E. Archer, son of Stephen C. and Catharine, was born, and has been declared to be the heir at law of said Eliza; that Stephen C. Archer was appointed guardian to Eliza during her life, but never made any report or inventory of her property, or took any step to have a division of the property made between Catharine and Eliza, and that no administration *de bonis non* of E. F. Barnes's estate has been granted, nor has administration been granted of Eliza F. Barnes's estate; that administration of the estate of Stephen C. Archer, in Claiborne county, was granted to Richard T. Archer in January, 1838, at which time there were thirty-four slaves of the estate of Barnes on the plantation, which Archer fraudulently took possession of, and had them appraised as the property of Stephen C. Archer's estate, and has cultivated the plantation partly for his own profit and partly for the estate of Stephen C. Archer for many years; that no division or distribution has been made of the estate of Edward F. Barnes, and that the property yet remains to be divided; that the rights of Catharine survived to her on the death of Stephen C. Archer, and that she and her husband are entitled to one half of the estate of Barnes, and for an account against Richard T. Archer for one half the hire and value thereof during the time he has had possession of the same. The bill seeks a general account against all the parties who have had the use and possession of the plantation and personal estate of Edward F. Barnes, against Abram Barnes's heirs for the years 1828 and 1829, against the complainant Catharine, for the years during which she had the use and benefit of the property, against Richard T. Archer as administrator for the use and benefit of the property received by Stephen C. Archer in his lifetime, and against him, individually, for the

use and profits since the death of Stephen C. Archer; and prays a division of the estate between the parties entitled to it, and for compensation for her dower interest in the land, which has never been set apart.

The answer admits many of the allegations of the bill, and states that the account of Abram Barnes, mentioned in the bill, was a final settlement with the probate court of his administration account; admits that no division of the estate of Barnes was made, and that the widow's dower was not assigned, and charges that before her marriage to Archer she disposed of five very valuable slaves of the estate; admits that no administration *de bonis non* of Edward F. Barnes's estate was granted, but the reason was that it was fully settled by Abram Barnes and delivered over to Catharine for herself and her daughter. Denies that any interest in the estate of Barnes survived to Catharine, but alleges that it vested in Stephen C. Archer on his marriage, he having taken and kept possession of it during his life, and since his death it having been in the hands of his administrators, and states that the question of title as between her and Archer's estate was pending and to be settled by the high court of errors and appeals; denies that the thirty-four slaves named in the bill were all the property of Barnes's estate, and states that three of them, Caty, Anne, and Robert, were purchased by Catharine during her widowhood, or by Stephen C. Archer in his lifetime; denies that complainants have any title to any of said slaves, and claims that they belong to the estate of Stephen C. Archer and Stephen E. Archer, and admits that he returned them as such to the probate court.

In an amended answer, Richard T. Archer states that he has learned since his original answer was made, that he improperly admitted that sixteen of the slaves named in the bill were of the estate of Edward F. Barnes. He now alleges that of those slaves, nine came to the possession of Catharine by inheritance, after the death of Barnes, and that the residue were purchased by her after his death, and that all of them belonged to her in her own right when she was married to Archer. He states, therefore, that he has only fifteen slaves in his possession belonging to the estate of Barnes.

Upon the final hearing on the bill, answers, exhibits, and proofs, the Chancellor dismissed the bill, to which decree the complainants have prosecuted this writ of error.

The first question for consideration is, whether the slaves and other personalty belonging to the estate of Barnes were so reduced to possession by Stephen C. Archer during his marriage, as to render the widow's interest in the estate his property. We do not perceive how any doubt can exist on this point under the repeated decisions of this court, and especially under the decision in 8 S. & M. in relation to this same estate and the rights of the parties interested in it. It is true that the question was raised there between the guardians of Stephen E. Archer and Harper and wife. But the facts under which the legal right was settled in that case are substantially the same as the facts presented in this record in relation to the right of Stephen C. Archer to the portion of Barnes's estate to which his widow was entitled. In this case, as in that, it is fully admitted that no division of Barnes's estate was ever made between his widow and child, and that Archer, after his marriage, lived on the plantation with his wife, and had possession and control of the undivided estate of Barnes, doing nothing to indicate a severance of the interest of the distributees or an appropriation of the specific property to his use, or a right of disposition of it as his property. Without any material difference between the two cases as to the facts touching the right of Archer to his wife's portion of the estate, the answer of his administrator in this case distinctly submits that question to the decision of this court in the case in 8 S. & M., which was not decided when the answer was made. In addition to that case being a decision upon the same claim involved in this case, it declares a sound legal principle which has been repeatedly sanctioned before and since that case was decided. *Duncan* v. *Johnson*, 23 Miss. 130; *Kilcrease* v. *Shelby*, Ib. 161. These cases are, therefore, conclusive of the point, that the right did not vest in Archer during his marriage, but survived to his widow upon his death.

The next subject of inquiry is, whether the slaves inherited by Mrs. Barnes from her sister came to the possession of Barnes

in his lifetime, so as to become his property and subject to distribution as such.

It is insisted in behalf of the defendants in error, that the evidence shows that these slaves never came to the possession of Barnes, inasmuch as he died in April, 1827, and it is proved that they were first brought on the plantation by Abram Barnes, his administrator, in January, 1828. This is the testimony of the witness Herrel, who states that he was the overseer on the plantation from November, 1827, until some time in the year 1831. He also states that the slaves may have been in the possession of Barnes in the spring of 1827, but if so, he did not know it, and that they were not on the plantation in the fall of 1826. On the contrary, the witness White proves that he was one of the appraisers of Barnes's estate, and at the time of the appraisement in June, 1827, these slaves were on Barnes's plantation, and appraised as his property, — and this fact is verified by the appraisement filed. It is clear, therefore, that the witness Herrel was mistaken in his recollection or opinion, and we think that all the circumstances connected with these slaves go to show that they were in the possession or under the control of Edward F. Barnes in his lifetime as his property.

It appears that Mrs. Barnes inherited the slaves from an only sister who died before her marriage to Barnes, which took place in 1825. Nothing is shown as to who had possession of them from that time till they were appraised. But they were then on the plantation of Barnes, and were appraised as his property with his other slaves. They must have been produced to the appraisers as his property by Abram Barnes, his administrator, who is shown to have been a man of intelligence and exemplary probity; and it is not to be supposed that such a man would have attempted to bring into the estate, slaves which his intestate had never had in possession or under his control. He was the brother of the intestate and well acquainted with his affairs, and must have had a better knowledge of the property belonging to him than the overseer, who came to the place after his death. In addition to this, no claim of separate property in these slaves was set up either by the widow before her second marriage, or by Archer after that marriage, which most probably

would have been done if it had not been known that they belonged to Barnes's estate. On the contrary, all parties up to the time of Archer's death appear to have recognized these slaves as in the same situation as the other slaves which he died in possession of.

It is said that, as Barnes's title to these slave, is denied by the answer, it was incumbent on the complainants to show positively that he had possession of them during his life. We do not think so. There is nothing in such a case requiring fuller proof of possession than in many other cases where that fact becomes an important question. And the cases are numerous where possession may be presumed from circumstances. Indeed the great lapse of time since the transaction occurred, the death of witnesses cognizant of a matter so unlikely to be known or remembered by many persons as who had the possession of particular slaves at a stated remote date, and the consequent difficulty of making positive proof upon such a point, would seem to render a resort to circumstantial evidence, in the absence of positive proof, necessary to the ends of justice.

We think, therefore, that these slaves must be regarded as having come to the possession of Barnes in his lifetime, and as constituting a part of his estate.

The next point to be considered is, whether the slaves Arthur, Venus, and their children are to be held as part of the estate of Barnes.

These slaves were not of the estate of Barnes at the time of his death, and the only evidence showing how they became connected with the estate, consists of the testimony of the witness Coburn, taken by the defendants, showing that Abram Barnes, the administrator, had purchased them from Dr. Moore's estate for the estate of Edward F. Barnes.

It is objected in behalf of the defendants, that the administrator had no right to make such a purchase for the estate. That may be true, but if no objection was made to it, it cannot be said that the property shall not go to the benefit of the estate because the administrator exceeded his authority in making the purchase. It does not appear that the parties interested in the estate made any objection to the act; and it would be

strange to say that property purchased for the estate and with its means, as must be presumed, should be lost to it because strangers think proper to object that the purchase was made without legal authority. But it is said that, inasmuch as the administrator made no charge in the account which he returned to the probate court for money advanced for these slaves, (which account is alleged to be his final settlement,) and as he acted as the friend and agent of the widow in managing all her business up to the time of his death, he must have purchased the slaves for her individual use.

To this there are several sufficient answers. 1st. The proof is that he made the purchase for the estate. 2d. His account returned to the court does not purport to be a final settlement, and cannot be considered in law as having that effect. It is made without notice, contains no order of discharge to him as administrator, nor order for distribution. It does not appear that he regarded it as a final settlement, for he received the proceeds of the crops for two years thereafter, and it must have been after that account was returned that he purchased these slaves; for otherwise it is to be presumed that he would have charged himself with the money paid. The probability, therefore, is much greater that he made the purchase with funds of the estate received after his account was rendered and for the use of the estate, than that he gratuitously used his own means or misapplied the funds of the estate to purchase slaves for the individual use and as the separate property of Mrs. Barnes.

We think, therefore, that the slaves in question must be treated in equity as the property of the estate, and chargeable accordingly.

We will now proceed to consider several questions involved in the account to be taken between the complainants and Stephen E. Archer, and Richard T. Archer in his own right and as administrator of Stephen C. Archer.

1. The first of these questions arises upon the slaves of Barnes's estate which were sold to David Moore, either by Mrs. Barnes during her widowhood, or by Stephen C. Archer after his marriage in pursuance of an agreement made with the widow before his marriage.

These slaves being sold before division of the estate between the widow and heir of Barnes, that act must be considered in law as a severance of her interest in the estate to the amount of the value of the slaves and an appropriation of them to her use, and so far as the husband participated in the sale, it must be considered as a reduction to possession of so much of the wife's interest in the estate. *Cabell* v. *Bell,* 1 How. 558; *Wade* v. *Grimes,* 7 Ib. 425. It may have been intended by the widow as a mere exchange of property and substitution of certain slaves for those belonging to the estate. But upon this point the testimony is very unsatisfactory and uncertain. It is clear that there was no power in Mrs. Barnes or Archer to dispose of the slaves of the estate otherwise than in virtue of her interest in the estate as a distributee, and in that way alone can the disposition be valid. It is also clear that they had no power to exchange the property of the estate so as to bind the other distributee to take the property obtained, instead of the value of that disposed of.

Considering the matter, therefore, in the only light in which the law can view it, it must be regarded as a sale of so much of Mrs. Barnes's interest in the estate; and it follows, that the slaves received in the transaction became her individual property, and belonged to her husband Archer and went to his administrator upon his death, and that in the account and division to be made between Mrs. Harper and Stephen E. Archer, she is chargeable with the value of the slaves belonging to the estate, and so disposed of. This result, which may appear in one point of view to be inequitable, is the legal consequence of her interference with, and disposition of, the estate before the division; and the rights of Stephen E. Archer as co-distributee cannot be prejudiced by her conduct.

2. The second question is whether the estate of Stephen C. Archer is liable for the crops raised on the plantation in the years 1834, 1835, and 1836, after his marriage, or whether they are to be charged against Mrs. Harper as so much of the estate reduced to possession by the husband.

It appears that, after the marriage, Stephen C. Archer lived on the plantation of Barnes's estate, had charge of the slaves,

and cultivated and sold the crops and received the proceeds. He does not appear to have claimed the proceeds of the plantation as his property, or to have disposed of the crops for his own use. On the contrary, it is shown that he carried on the plantation and made accounts in relation to it, in the name of the estate and separate from his individual accounts. From the nature of this part of the property, it had necessarily to be sold. But nothing is shown to justify the conclusion that he sold the crops as his own property, or that he was acting otherwise than as the agent or trustee of the parties. And it is well settled that it is not merely the possession of property which confers a right in such cases, but there must be a claim of title or unequivocal acts indicating such a claim.

When the money came to his hands, he was entitled to such portion of it as belonged to his wife, because from its nature, the possession coupled with the right was absolute ownership; but as to the portion due the child, he was not entitled to it, did not claim it as his property, and cannot be considered in law or equity as having appropriated it to his use, so as to make his wife's interest in the estate chargeable with it in an account between her and the child. On the contrary we think that, as to the child's portion of the money, the father must be regarded as having received it as trustee or guardian for him, and that the father's estate is chargeable with it in the account to be taken. The condition of Stephen C. Archer is not different in this respect from what it would have been if the estate had been carried on by the administrator, who had paid over to Archer the proceeds of the crops, not especially on account of his wife's share of the estate; in which case there can be no doubt that Archer would be regarded in equity as having received the portion due his son as his trustee or guardian, and be held accountable accordingly.

3. The next point is, whether Mrs. Harper should be charged with the proceeds of the estate for the years 1828 and 1829.

She is sought to be so charged on the ground that Abram Barnes, the administrator, settled his final account in August, 1828, and surrendered the estate to her. But we have above seen that the account of Abram Barnes cannot be considered

as a final settlement, and consequently the estate was in his charge and he must be held accountable for it.

On the other hand, the complainants seek to charge Barnes's estate for the proceeds of the crops during those years, and pray an account against Richard T. Archer and wife, the distributees of Abram Barnes, for the avails of the property received by Barnes for those years. We can perceive no ground for entertaining such a claim in a court of equity. If it were well founded, no sufficient reason is shown why it has not been asserted in the probate court, and why so great a lapse of time has been permitted to intervene before asserting it.

4. In the account to be taken, Mrs. Harper will be chargeable with the net proceeds of the estate of Barnes for the years 1830, 1831, 1832, and 1833, after deducting the necessary and proper charges for the support, education, and maintenance of Eliza F. Barnes; also, with the hire of the slaves of the estate which have remained in her possession and use, and also with the value of the articles she has received from the estate of Barnes since the death of Stephen C. Archer.

Richard T. Archer will be chargeable individually with the annual value of all the slaves and other personal property of the estate of Edward F. Barnes of which he has had the use or possession since the death of Stephen C. Archer, and with the rents and profits of the dower interest of the widow in the real estate for the same time. The estate of Stephen C. Archer cannot be chargeable to the distributees for the use and possession of the property since his death, because all his interest in the estate ceased with his death, and Richard T. Archer as his administrator had no right to or interest in the estate. His connection with it is, therefore, in law that of an individual, and as such he is accountable.

In relation to the dower interest of Mrs. Harper it is insisted, in behalf of the defendants, that she is entitled to no compensation on that account, because she has not seen proper to have her dower set apart as she had a right to do. It is true that she might have had her dower assigned, but her failure to do so can be no reason why she should not receive compensation for her right from one who has had the benefit of it. It is also true, as

20 *

is contended, that at law the widow was not entitled to rent for her dower interest until it had been set apart. But a different rule prevails in equity, which will give an account for mesne profits before the assignment, Story's Eq. Jur. § 626; and though she die before her right to dower be established, equity will decree an account of the rents and profits in favor of her representatives. Ib. § 625; Fonbl. Eq. Book I. Ch. 3, § 3, note k; Park on Dower, 352. It is, therefore, clear that she is entitled to an account from the time of the death of Archer as sought in the bill.

We have thus examined the material points necessary in settling the rights of the parties, and in taking the account necessary to the adjustment of those rights; and it follows from the views we take of the case, that the decree was erroneous in dismissing the bill. It is, therefore, reversed, and the case remanded to the superior court of chancery, with directions to decree an account to be taken in accordance with the views and principles herein stated, the costs in this court to be paid by the defendants.